UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SARAH PERKINS, EMILY WRIGHT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RUGS.COM LLC,<br><br>Defendant. | CASE NO. 2:25-cv-00019-JHC<br><br>ORDER DENYING MOTION TO COMPEL ARBITRATION |

**I**

**INTRODUCTION**

This matter comes before the Court on Defendant Rugs.com LLC's Motion to Compel Arbitration. Dkt. # 5. The Court has considered the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law. The Court finds oral argument unnecessary. Being fully advised, for the reasons below, the Court DENIES the motion.

ORDER DENYING MOTION TO COMPEL ARBITRATION - 1

II

BACKGROUND

Rugs.com is an online retailer selling rugs and other home décor through its website www.rugs.com. Dkt. # 13 at 6.[1] Below is an image from its site:



Dkt. # 14-1 at 10.[2]

Plaintiffs Sarah Perkins and Emily Wright subscribe to emails from Rugs.com. *See* Dkt. # 1-1 at 8, 10 ¶ 33, 38.[3] Plaintiffs signed up for emails from Rugs.com by inputting their email addresses on the website and clicking the "Join Now" button. Dkt. # 14-1 at 17. Below is an image showing the button:

---

[1] The information contained in this section derives from Plaintiffs' Complaint and the parties' briefing and exhibits related to the motion.
[2] The images used in this Order were provided to Plaintiffs by Rugs.com in response to Plaintiffs' Requests for Production. Dkt. # 14 at 2. They were attached as exhibits to the Declaration of Blythe H. Chandler. *Id.*
[3] The Complaint does not specify when Plaintiffs signed up for emails from Rugs.com. *See generally* Dkt. #1-1. But it appears that Wright has been receiving emails from Rugs.com since 2020. *See id.* at 8 ¶ 30. Further, Rugs.com's records show that Perkins signed up for emails in March 2024. Dkt. # 5-1 at 4 ¶ 11.



*Id.*

Rugs.com's Terms of Use are available via a "Terms of Use" hyperlink at the bottom of each page on the site. Dkt. # 14-1 at 18. It appears in black text set against a grey background. *Id.* It appears to the right of another hyperlink labeled "Privacy Policy." *Id.* The image below shows the hyperlinks:

ORDER DENYING MOTION TO COMPEL ARBITRATION - 3

The record does not show that Plaintiffs ever clicked on the "Terms of Use" hyperlink or read Rugs.com's Terms of Use. *See* Dkt. ## 14-2, 14-3 at 19. Had Plaintiffs clicked on the hyperlink, they would have been taken to a page containing the full text of Rugs.com's Terms of Use. *See* Dkt # 5-2. The Terms of Use state, in relevant part,

> PLEASE READ THESE TERMS AND CONDITIONS CAREFULLY BEFORE USING THE SITES. YOUR ACCESS AND/OR USE OF A SITE CONFIRMS YOUR UNCONDITIONAL ACCEPTANCE OF THE FOLLOWING TERMS. IF YOU DO NOT FULLY ACCEPT THESE TERMS, DO NOT USE OR ACCESS A SITE. These Terms of Use constitute an agreement between Rugs.com LLC and you.

*Id.* at 2. Paragraph 18 contains an arbitration provision, which states,

> **18. Legal Disputes and Arbitration**
>
> YOU AND RUGS.COM LLC AGREE TO GIVE UP ANY RIGHTS TO LITIGATE CLAIMS IN A COURT OR BEFORE A JURY OR TO PARTICIPATE IN A CLASS ACTION OR REPRESENTATIVE ACTION WITH RESPECT TO A CLAIM. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT, SUCH AS ACCESS TO DISCOVERY, ALSO MAY BE UNAVAILABLE OR LIMITED IN ARBITRATION. Any dispute, claim, demand, disagreement, or controversy between you and Rugs.com LLC, its agents, employees, officers, directors, principals, successors, assigns, subsidiaries, and/or affiliates (collectively, "Rugs.com"), whether sounding in tort, contract, quasi-contract, equity, or by statute, arising from or relating your use of the site, your purchase of any goods, and/or to these Terms of Use and their interpretation or breach, termination, or validity thereof, the relationships which result from these Terms of Use, including disputes about the validity, scope or enforceability of the mandatory arbitration provision contained therein (collectively, "Claims") will be settled by binding arbitration.

*Id.* at 7.

Plaintiffs sued Rugs.com on behalf of themselves and a putative class of similarly situated individuals. Dkt. #1-1. They assert that Rugs.com sent them false and misleading emails with subject lines designed to trick consumers into opening the email and making purchases. *Id.* at 2 ¶ 1. For example, Plaintiffs say that on May 20 and 21, 2024, Rugs.com sent emails about an up to 80% off "Memorial Day Preview Sale" that

was "Ending Soon!" but Rugs.com continued to offer the sale for the next nine days, through May 29, 2024. *Id*. at 10 ¶ 38. Plaintiffs contend that Rugs.com's practices violate the Washington Commercial Electronic Mail Act, RCW 19.190, and the Washington Consumer Protection Act, RCW 19.86. *Id*. at 3 ¶ 5. Rugs.com now moves to compel arbitration. Dkt. # 5.

Rugs.com contends that Plaintiffs must pursue their claims in individual arbitration because of the arbitration provision included in the Terms of Use. Dkt. # 5. It asserts that Plaintiffs are bound by the Terms of Use because they visited the website and signed up to receive promotional emails. Dkt. # 5 at 7. Plaintiffs contend that they are not bound by this arbitration provision because they did not assent to Rugs.com's Terms of Use. Dkt. # 13 at 13–17.

### III
#### DISCUSSION

A.   The Federal Arbitration Act

Under the Federal Arbitration Act (FAA), written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). In passing the FAA, Congress "directed courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and enforceable.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018) (quoting 9 U.S.C. § 2). "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

When evaluating a motion to compel arbitration, courts generally limit their review to two issues: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

B.   The Existence of an Agreement to Arbitrate

As for the first requirement, the party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023) (citing *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)); *see also Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) ("The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.") (internal quotation omitted).

"In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). And "although online commerce has presented courts with new challenges, traditional principles of contract still apply." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019); *Nguyen*, 763 F.3d at 1175 ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.").

The parties agree that Washington law governs the contract formation issue. Dkt. ## 5 at 8; 13 at 2. Washington follows the objective manifestation test for contract formation. *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wash.2d 692, 699, 952 P.2d 590 (1998); *see also Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wash. 2d 171, 177, 94 P.3d 945 (2004) (stating

that "for a contract to form, the parties must objectively manifest their mutual assent").  Courts glean mutual assent "from outward manifestations and circumstances surrounding the transaction."  *Burnett v. Pagliacci Pizza, Inc.*, 196 Wash. 2d 38, 50, 470 P.3d 486, 492 (2020) (internal citation omitted).  And "[t]he party asserting the existence of . . . a contract, whether express or implied, bears the burden of proving each essential element, including the existence of a mutual intention.  *Becker v. Wash. State Univ.*, 165 Wash. App. 235, 246, 266 P.3d 893 (2011) (internal citation omitted).

Contracts formed online typically fall into two categories: "clickwrap" (also known as "click-through") or "browsewrap" agreements.  *See Nguyen*, 763 F.3d at 1175–76 (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).  To enter into a clickwrap agreement, a website user clicks an "I agree" box after the website presents them with a list of terms and conditions of use.  *Id.*  As for browsewrap agreements, the website's terms and conditions of use are usually posted at the bottom of the webpage and accessible via a hyperlink.  *Id.*

At issue here is a browsewrap agreement.  The website user purportedly assents to Rugs.com's Terms of Use simply by using the website without having to visit the Terms of Use webpage or needing to acknowledge that by using the website they assent to the Terms of Use.  *See Be In, Inc. v. Google Inc.*, No. 12–CV–03373–LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013) ("The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists."); Dkt. # 14-1 at 1–22.  And "[b]ecause no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen*, 763

ORDER DENYING MOTION TO COMPEL ARBITRATION - 7

F.3d at 1176 (9th Cir. 2014) (quoting *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011)); *Gill v. Chipotle Mexican Grill, Inc.*, No. 8:24-CV-01672-FWS-JDE, 2025 WL 287320, at *3 (C.D. Cal. Jan. 23, 2025) (noting that "[c]ourts are more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms.") (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)) (alteration in original).

Rugs.com contends that Plaintiffs assented to the arbitration provision because the "Terms of Use" hyperlink is available at the bottom of each page on its website. Dkt. # 5 at 6. It also argues that Plaintiffs are bound by the arbitration provision because they signed up for emails from Rugs.com on the website. *Id.* at 9. The company says that "reasonable users" of Rugs.com would know that by using the site, including providing their email to the company, they are subject to "legal consequences, like a binding contract." *Id.*

Plaintiffs respond that Rugs.com did not provide them with "reasonably conspicuous notice" of the Terms of Use. Dkt. # 13 at 12 (quoting *Berman*, 30 F.4th at 856). They say that the "Terms of Use" hyperlink is located at the bottom of the webpage in a small font and is not distinguishable from the surrounding non-hyperlinked text. *Id.* They contend that the "Join Now" button to subscribe to emails is not preceded by or followed by any text suggesting that clicking on the button constitutes an acceptance of the Terms of Use. *Id.* at 14 (citations omitted). They also say that the "Join Now" button and the "Terms of Use" hyperlink are not located near each other and there is no reason for a consumer to scroll down to the "Terms of Use" hyperlink on the bottom of the page.

No evidence suggests that Plaintiffs had actual knowledge of Rugs.com's Terms of Use. *See* Dkt. ## 14-2, 14-3 at 19. Thus, "the validity of the browsewrap agreement turns on whether

the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. And whether a user had inquiry notice of the contract "depends on the design and content of the website and the agreement's webpage." *Id.* As the Ninth Circuit observed, "where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." *Id.* (collecting cases). The law demands at least some level of perspicuity.

Here, the "Terms of Use" hyperlink is at the bottom of the webpage and the text is in a small black font against a grey background. Dkt. # 14-1 at 18; *See Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000) (refusing to enforce browsewrap agreement where textual notice appeared in small gray print against a gray background); *cf. Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023)("[C]rucially, the 'Terms of Use' hyperlink is conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent."). And the webpage pairs colorful images of Rugs.com's products with large, bright fonts promoting the products. Dkt. # 14-1 at 10. This makes the small "Terms of Use" hyperlink placed at the very bottom of the webpage even less conspicuous. The textual notice is "deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from" the small text at the bottom of the webpage. *Berman*, 30 F.4th at 857. Consequently, it is less likely that a reasonable Internet user would have seen the "Terms of Use" hyperlink. *See* Dkt. # 14-1 at 10–18; *see also Berman*, 30 F.4th at 856 (emphasizing that "to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it").

And Rugs.com's contention that Plaintiffs' decision to sign up for promotional emails from Rugs.com put them on inquiry notice of the Terms of Use is unavailing. As Plaintiffs point

ORDER DENYING MOTION TO COMPEL ARBITRATION - 9

out, they simply clicked on the "Join Now" button to sign up for promotional emails.  They were not provided with any information that would put a reasonably prudent web user on notice that by signing up for promotional emails that they would be assenting to Rugs.com's Terms of Use.  *Cf. Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1190 (W.D. Wash. 2024) (determining that the plaintiffs were put on inquiry notice because during the online account creation process, users were informed that by clicking on a button they assented to the company's terms and conditions).  And even though Rugs.com contends that its Terms of Use were conspicuous because of the proximity between the "Join Now" button and the "Terms of Use" hyperlink, Dkt. # 15 at 3, "even close proximity of the hyperlink to relevant buttons users must click on— without more—is insufficient to give rise to constructive notice."  *Nguyen*, 763 F.3d 1171, 1178– 79 (9th Cir. 2014).[4]  As the Ninth Circuit observed in *Nguyen*, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound."  *Id.* at 1179.

Thus, Plaintiffs did not have sufficient notice that by visiting Rugs.com's webpage and signing up for promotional emails that they would be bound by the company's Terms of Use.

---

[4] Rugs.com asserts that the "Join Now" button and "Terms of Use" hyperlink "always appear together," but there is colorful text and images below the "Join Now" button and above the "Terms of Use" hyperlink.  *See* Dkt. ## 14-1 at 17–18;15 at 4.  Thus, there is no reason to believe that a reasonable web user would assume a relationship between the button and the hyperlink.  *See Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1096–97 (C.D. Cal. 2023) (noting that "when the terms and conditions to which a user is asked to agree are accessed through a hyperlink, 'the design of the hyperlinks must put such a user on notice of their existence,' and '[a] web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text.'") (quoting *Berman*, 30 F.4th at 857) (alteration in original).

ORDER DENYING MOTION TO COMPEL ARBITRATION - 10

Accordingly, Plaintiffs did not unambiguously manifest assent to the Terms of Use, and they are not bound by the arbitration provision contained therein.[5]

## IV
## CONCLUSION

Based on the above, the Court DENIES the motion to compel arbitration.

Dated this 3rd day of June, 2025.

*John H. Chun*
John H. Chun
United States District Judge

---

[5] Because Plaintiffs did not manifest their assent to the Terms of Use, the Court need not reach Rugs.com's remaining arguments.